### BENSON *v.* UNITED STATES.

*(Circuit Court, N. D. New York.* November 12, 1890.)

1. INDIAN COUNTRY—WHAT CONSTITUTES—FEDERAL JURISDICTION.
   Act Cong. Feb. 19, 1875, (18 St. at Large, p. 330,) provided for the appointment of commissioners to survey and establish proper boundaries for the villages upon the Cattaraugus and Allegany Indian reservations in New York, and declared that all Indian leases within such limits should be valid, and that all municipal laws and regulations of New York might be extended over such villages. The boundaries were thereafter established, and the villages incorporated, and the general laws of New York were, by statute, (Laws N. Y. 1881, c. 188,) extended over such villages. *Held,* that one of such villages was not "Indian country," within the meaning of Rev. St. U. S. § 2139, prohibiting the introduction of spirituous liquor into "the Indian country."

2. SAME.
   Irrespective of the act of 1875, such villages cannot be considered "Indian country," within the meaning of section 2139, as Act Cong. June 30, 1834, which was a revision of former acts regulating trade with Indian tribes, and which contained the provision now embodied in section 2139, in describing what lands should be deemed "Indian country" for the purposes of the act, included only lands outside the territorial limits of any state then existing, and, by providing that "the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States * * * shall extend to the Indian country," showed that by such country was meant territory "within the sole and exclusive jurisdiction of the United States."

At Law. On writ of error from district court.
*Martin I. Townsend,* for plaintiff in error.
*M. W. Norton,* Asst. U. S. Atty.

WALLACE, J. The question in this case is whether the village of Salamanca, a village of white inhabitants, containing a population of 4,000 persons, and incorporated under the laws of this state, is "Indian country," within the meaning of section 2139 of the United States Revised Statutes. For the purpose of having this question decided in this court, upon the trial in the district court, at the suggestion of both parties, the district judge made a *pro forma* ruling against the plaintiff in error; and, a verdict of guilty having been rendered, and sentence pronounced, the circuit and district judges, sitting together, have heard the question upon writ of error. That section declares that every person "who introduces or attempts to introduce any spirituous liquor or wine into the Indian country shall be punishable by imprisonment for not more than two years, and by a fine of not more than $300." The plaintiff in error was licensed to sell spirituous liquors in Salamanca by the proper local authorities, conformably to the act of the legislature of this state of April 11, 1870, to regulate the sale of intoxicating liquors; and he has been convicted of an offense under section 2139 upon evidence which shows that he brought liquors to his place of business at Salamanca, and sold them there at various times, as by the terms of his license he was permitted to do. It is insisted for the government that, inasmuch as Salamanca is located within the exterior boundaries of the Allegany Indian reservation, the plaintiff in error was properly convicted, although there was no evidence of any attempt or intent on his part to introduce

liquors into the reservation beyond the village limits. The Allegany reservation is comprised of lands in Cattaraugus county, in this state, to which the title of the Seneca Nation of Indians has not been extinguished, except to the extent effected by the leases, and the provisions of an act of congress of 1875, hereinafter referred to. Prior to the time of the adoption of the federal constitution, the states of Massachusetts and New York had each claimed territorial sovereignty over the lands; but in 1786 the dispute was settled by a cession from Massachusetts to New York of the "sovereignty and jurisdiction of the lands," and from New York to Massachusetts of the "right of pre-emption of the soil from the native Indians." See *Blacksmith* v. *Fellows,* 7 N. Y. 401, 19 How. 366. November 11, 1794, a treaty was entered into between the United States and the Six Nations, in which the title to the lands within the Allegany reservation was acknowledged by the United States to belong to the Seneca Nation of Indians. In the progress of the general development of the country, settlements of whites grew upon this reservation, acquired names and coherency, and became flourishing communities. The Indians leased their lands within the boundaries of these settlements, and moved their domiciles elsewhere. Corporations obtained leases from the Indians, and built railroads through the reservation. Gradually the line of demarkation between the areas upon the reservation occupied by the whites and by the Indians became distinctly defined. At the time of the trial, the only resident Indians in Salamanca were two women, each of whom was married to a white man; and all the lands within the village limits were in the occupation of white men, under Indian leases. In 1875, congress passed an act to authorize the Seneca Nation to lease lands within the Cattaraugus and Allegany reservations, and to confirm existing leases. Act Feb. 19, 1875; 18 St. at Large, 330. This act provided for the appointment of commissioners to survey and establish proper boundaries and limits for the villages upon these reservations, including Salamanca. It also provided that all Indian leases of land within such limits should be valid upon the lessor and upon the Seneca Nation. It provided for successive renewals of these leases at the option of the lessees, their heirs or assigns. Finally it declared that all the municipal laws and regulations of the state of New York might be extended over and be in force within said villages. Thereafter, the boundaries were established, and the villages were incorporated, and in 1881 the state legislature (chapter 188, Laws 1881) extended the general laws of the state over the village of Salamanca, and the other villages named in the act of congress. The statute under which the plaintiff in error was convicted is found in that chapter of the Revised Statutes of the United States entitled: "Government of Indian Country." Section 2133 of the same chapter makes it a crime for any person other than an Indian to attempt to reside in the "Indian country" as a trader, or to introduce goods or trade therein, without a license from the government agent. Section 2134, the same chapter, makes it a crime for any foreigner to go into the "Indian country" without a passport from the department of the interior, or some other designated officer of

the government. Manifestly, the term "Indian country" has the same meaning in each of these sections. Consequently, if the contention for the government is sound, every merchant of Salamanca, and of the several other villages within the boundaries of the Allegany reservation, every "butcher and baker and candlestick maker," and every foreigner who visits one of them, is a criminal, and subject to severe punishment by fine and imprisonment by the laws of the United States. In view of the terms of the act of congress of 1875, the statement of this proposition is the only argument necessary to show that it cannot stand. There would be an unreconcilable antagonism between statutes which forbid and punish these things and the later law of congress which recognizes the existing situation in 1875, and sanctions them. The law of 1875 authorized the state to permit all the previously prohibited acts by allowing it to extend all its municipal laws and regulations over these villages. Whether this permission enlarged in the least the sovereignty of the state over the persons and personal rights of its own citizens need not be considered; it suffices that the state has acted upon it, and has extended over these villages, among other laws, that one which allows the traffic in spirituous liquors,—a law which was on the statute-book when the act of 1875 was passed. After this has been done, the traffic in spirituous liquors, as well as all other kinds of traffic in these villages, is sheltered by the consent of congress; and the rights of white persons to visit these villages, and to reside there, are no longer abridged by the provisions of the previous statutes. The present case might therefore be disposed of upon the consideration that the act of 1875 withdraws Salamanca, and the other villages upon the reservation, from the operation of the statutes for regulating the government of Indian country.

Irrespective of the act of 1875, the conclusion seems irresistible that none of these villages, and none of the Indian reservations within this state, are Indian country, within the meaning of the three sections of the Revised Statutes mentioned. It is unnecessary to consider the question of the power of congress to extend such statutes over the Indian reservations of this state, even to the exclusion of any state jurisdiction over the lands of the Indians, or over criminal offenses committed within their territory, so long as the reservations are occupied by Indians in tribal organization. The government of the United States has always regarded the Indian tribes as distinct communities, in a state of semi-independence and pupilage, between which and it certain international relations were to be maintained; and both the legislative and judicial departments of the national government have always emphatically asserted that the Indian tribes possess such a national character as to be within the treaty-making power of the constitution, and outside the sphere of state jurisdiction over their persons or their lands so far as the national authority has intervened. As early as in 1802, by the twelfth section of the act of congress for regulating trade and intercourse with the Indian tribes, it was declared that no purchase of lands made from any Indian or any Indian tribe or nation within the United States should be "of any validity in law or equity, unless the same be made by treaty or convention,

entered into pursuant to the constitution." In 1832, the supreme court, in *Worchester* v. *State*, 6 Pet. 515, declared that the whole intercourse between the United States and an Indian nation was by our constitution and laws vested in the government of the United States, and that within the territory occupied by such Indians in the state of Georgia the laws of Georgia had no force unless with the assent of the Indians themselves, or in conformity with treaties and acts of congress.

In the recent case of *U. S.* v. *Kagama*, 118 U. S. 375, 6 Sup. Ct. Rep. 1109, an act of congress, giving jurisdiction to the courts of the United States over the crimes of arson, burglary, and murder, when committed against the person or property of an Indian or other person on an Indian reservation within a state, was upheld as constitutional by the supreme court. The court declared that the government of the United States has the right and authority, instead of controlling the Indian tribes by treaties, to govern them by acts of congress, and that, the Indians being necessarily subject to the laws which congress may enact for their protection, and for the protection of the people with whom they come in contact, the states have no such power over them as long as they maintain their tribal relations. But the question now involved is not one of the power of the national government over Indians or Indian reservations within the states; it is one as to the extent of its exercise by congress over Indian country under the trade and intercourse acts. A brief consideration will demonstrate that certainly since 1834 the Indian reservations of this state have not been embraced in the Indian country of the laws of congress. The term "Indian country" originated in the acts of congress passed in or prior to 1834 to regulate trade and intercourse with the Indian tribes. The act of June 30, 1834, which was a revision and repeal of the former acts regulating trade and intercourse with the Indian tribes, contained the identical provisions which are now embodied in sections 2133, 2134, and 2139 of the Revised Statutes. That act specifically described what lands in the United States were to be deemed Indian country for the purpose of the act, and thus defined what was meant by the term as used in the original statutes, from which the three sections are taken. The lands described comprised parts of the United States which were outside of the territorial limits of the then existing states. As interpreted by the supreme court in *Bates* v. *Clark*, 95 U. S. 204, the Indian country of this act comprised the lands west of the Mississippi river, to which the Indian title had not been extinguished, not within any state or organized territory, and the lands east of the Mississippi river to which the Indian title had not been extinguished, not within any state. The country east of the Mississippi, not within any state, was the region then under the government of Michigan territory, now constituting the states of Michigan and Wisconsin. All the "Indian country" east or west of the Mississippi was "lands not within any state." After this act was passed, and before the Revised Statutes were adopted, new territory had been acquired by the United States, new territorial governments had been established, and new states had been admitted to the Union; and when some of the new states were

admitted, and new territories were organized, provisions had been made in the organic law by congress that certain lands in the possession of the Indian tribes should not be deemed a part of the new state or territory. *The Kansas Indians,* 5 Wall. 756; *Harkness* v. *Hyde,* 98 U. S. 476; *Langford* v. *Monteith,* 102 U. S. 145. Indian lands which were not within any state in 1834 were now in the new states. New Indian country had been added to the national domain. Under these circumstances, the language of the act of 1834 was inappropriate to describe what lands should be deemed Indian country at the time of the revision and consolidation of the General Statutes of the United States. But although the former definition of "Indian country" was abrogated it may properly be referred to for interpretation. The omission of an inapplicable definition does not imply that in revising the statutes congress intended to enlarge the area of Indian country, or subject to the regulations of the Indian intercourse laws territory which for 40 years had not been included in the sphere of regulation. In *Bates* v. *Clark,* the supreme court interpreted the meaning of the term in the Revised Statutes by recourse to the definition of the act of 1834; and the court held that all the country embraced in the description of the act of 1834 remains Indian country, within the meaning of the Revised Statutes, so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or act of congress. In *Ex parte Crow Dog,* 109 U. S. 556, 3 Sup. Ct. Rep. 396, the question again arose as to what country, being Indian country under the act of 1834, was still Indian country under the Revised Statutes; and the court decided that the term, as used in the Revised Statutes, applies to all country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, except that within the boundaries of states, and that it embraces all territory within the boundaries of states actually occupied by Indians and excluded by statute or treaty from state jurisdiction. According to the opinion in that case, no territory with the boundary of the states, although it was Indian country in 1834, is Indian country under the Revised Statutes, unless it is excluded by treaty or statute from state jurisdiction, although actually occupied by Indians. Inasmuch as the Indian reservations of this state were not Indian country in 1834, and as no lands are now included within that country which were not within it then, the three sections of the Revised Statutes which have been mentioned have no application to these reservations. Some of the lands in the reservations of this state are now actually occupied by Indians, and the Allegany reservation, outside the villages, is occupied by Indians which still maintain their tribal relations. The state of New York always exercised its sovereign powers within these reservations, and since 1858, when the case of *New York* v. *Dibble,* 21 How. 366, was decided by the supreme court, its right to do so, so far as necessary to protect the property and persons of Indians in this state, and to preserve the public peace, has never been questioned. Among others, it has enacted

laws to punish the sale or gift of spirituous liquors to Indians.    The conclusions thus reached lead to a reversal of the judgment of the district court.

COXE, J., concurred in the result, upon the ground that, under the provisions of the act of congress of February 19, 1875, (18 St. at Large, p. 330,) and the act of the legislature of New York of May 2, 1881, (Sess. Laws 1881, p. 288,) extending the municipal laws of the state over the villages of the Allegany reservation, the village of Salamanca, where the defendant resides, is not "Indian country," within the meaning of section 2139 of the Revised Statutes.