## UNITED STATES v. MYERS.

(Circuit Court of Appeals, Eighth Circuit. May 3, 1913.)

No. 3,825.

1. INDIANS (§ 37*)—TRESPASS ON INDIAN LANDS—"INDIAN COUNTRY."

By the treaty of October 21, 1892, ratified by Act June 6, 1900. c. 813, 31 Stat. 676, between the United States and the Kiowa, Comanche, and Apache tribes of Indians in Oklahoma, such tribes ceded to the United States absolutely all their lands therein described subject to the allotment of lands to their members in severalty and the setting apart of a tract for grazing purposes. Held, that by such cession all the lands embraced therein ceased to be "Indian country," or subject to the provisions of Rev. St. § 2148, that "if any person who has been removed from the Indian country shall thereafter at any time return or be found within the Indian country he shall be liable to a penalty of $1,000," and that such character as Indian country was not restored to lands subsequently set apart by executive order of the Interior Department of June 20, 1901, for the purposes of an Indian school.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 56; Dec. Dig. § 37.*]

2. INDIANS (§ 37*)—"INDIAN COUNTRY."

"Indian country," as the term is used in federal statutes, is a country to which the Indians retained the right of use and occupancy, involving under certain restrictions freedom of action and of enjoyment in their capacity as a distinct people, and ceases to be such when their title is extinguished unless by virtue of some reservation expressed at the time and clearly appearing.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 56; Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 4, pp. 3545–3549.]

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action for a penalty by the United States against L. W. Myers. Judgment for defendant, and plaintiff brings error. Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Isaac D. Taylor, Asst. U. S. Atty., of Guthrie, Okl. (Homer N. Boardman, U. S. Atty., of Oklahoma City, Okl., George F. Zimmerman and W. B. Herod, Asst. U. S. Attys., of Guthrie, Okl., and H. E. Bretschneider, Sp. Asst. U. S. Atty., of Anadarko, Okl., on the brief), for the United States.

Everett W. Pattison, of St. Louis, Mo. (Edward D'Arcy, of St. Louis, Mo., on the brief), for defendant in error.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. [1] Plaintiff in error instituted this action in the district court of Caddo county, in the then territory of Oklahoma. November 16, 1905, it filed an amended petition, the following paragraphs of which are especially pertinent to the questions here to be considered:

"That on the 5th day of June, 1901, the following described tract of land, to wit, the northeast quarter of section thirteen, township six north, range sixteen west of the Indian meridian, in Kiowa county, Oklahoma Territory, was duly set apart by order of the Secretary of the Interior from the Kiowa, Comanche and Apache reservations for the use of the Rainy Mountain Boarding School commonly know as the Rainy Mountain Indian Training School, a school established by the government of the United States for the education and civilization of Indians; that said tract of land was at all of the times hereinafter stated and now is exclusively used for the use of the Kiowa, Comanche and Apache Indians and is and was at all the times hereinafter mentioned Indian country within the meaning of section 2148 of the Revised Statutes of the United States, and was and is under the control of Col. James F. Randlett as United States Indian agent for the Kiowa agency.

"Plaintiff further avers that the defendant, L. W. Myers, has for the past four years been in the business of loaning money for himself and others at usurious rates of interest to Kiowa, Comanche and Apache Indians, wards of the government and under the charge and control of said James F. Randlett, as United States Indian agent, and which said Indians received allotment of land during the year 1900 and 1901 under the act of Congress of June 6, 1900."

It is then further averred that the defendant in error unlawfully trespassed upon the land in question for the purpose of collecting usurious interest from the Indians; that his presence and purpose were detrimental to the welfare of the Indians; that he was ejected from said tract by order of the Indian agent in charge, and notified that he must not return thereon under penalty of law; that thereafter, in defiance of such order, defendant in error returned and twice repeated the trespass. The petition in two counts prays judgment against the defendant in error in the sum of $2,000, under section 2148 of the Revised Statutes, which reads as follows:

"If any person who has been removed from the Indian country shall thereafter at any time return or be found within the Indian country, he shall be liable to a penalty of one thousand dollars."

To this petition the defendant in error interposed a general demurrer, which was sustained, and judgment was entered dismissing the cause; thereafter plaintiff in error perfected its appeal, which, after

the admission of Oklahoma as a state passed to the United States District Court for the Western District of Oklahoma, by which the judgment was affirmed. The affirmance of this judgment, sustaining the demurrer of defendant in error and dismissing the cause, is the only error assigned. The court below based its action upon the ground that the land in question had ceased to be Indian country at the time of the alleged violation, and therefore that section 2148 of the Revised Statutes was inapplicable.

The act of June 6, 1900, c. 813, 31 Stat. 676, was passed in ratification of an agreement between the United States and the Kiowa, Comanche, and Apache tribes of Indians in Oklahoma entered into October 21, 1892, whereby, in return for the allotment of land in severalty to the individual members of these tribes, and other good and valuable considerations specified, all these tribal lands, including that in question, were relinquished to the United States. The comprehensiveness of the grant made is disclosed by the following quotations from the act:

"Subject to the allotment of land, in severalty to the individual members of the Comanche, Kiowa, and Apache tribes of Indians in the Indian Territory, as hereinafter provided for, and subject to the setting apart as grazing lands for said Indians, four hundred and eighty thousand acres of land as hereinafter provided for, and subject to the conditions hereinafter imposed, and for the considerations hereinafter mentioned, the said Comanche, Kiowa, and Apache Indians hereby cede, convey, transfer, relinquish, and surrender, forever and absolutely, without any reservation whatever, express or implied, all their claim, title, and interest, of every kind and character, in and to the lands embraced in the following described tract of country in the Indian Territory, to wit: [Here follows the specific description.]    *    *    *

"As a further and only additional consideration for the cession of territory and relinquishment of title, claim, and interest in and to the lands as aforesaid, the United States agrees to pay to the Comanche, Kiowa, and Apache tribes of Indians, in the Indian Territory, the sum of two million (2,000,000) dollars.    *    *    *"

The only reference made to the sections of land of which the tract here involved forms a part is the following:

"That sections sixteen and thirty-six, thirteen and thirty-three, of the lands hereby acquired in each township shall not be subject to entry, but shall be reserved, sections sixteen and thirty-six for the use of the common schools, and sections thirteen and thirty-three for university, agricultural colleges, normal schools, and public buildings of the territory and future state of Oklahoma; and in case either of said sections, or parts thereof, is lost to said territory by reason of allotment under this act, or otherwise, the governor thereof is hereby authorized to locate other lands not occupied in quantity equal to the loss."

June 20, 1901, the Secretary of the Interior issued an order reserving from the public domain, thus ceded, certain lands for agency, school, religious, and other public uses. That order, in so far as it pertains to the subject-matter of this controversy, is in the following terms:

Schedule of land reserved for agency, school, religious, and other public uses in the Comanche, Kiowa, and Apache reservation in Oklahoma, in accordance with the sixth section of the act of Congress approved June 6, 1900

(Public No. 185) and under instruction of the Commissioner of Indian Affairs, dated June 11, 1900, and approved by the Secretary of the Interior.

| Permanent Name | Subdivision | Sec. | Tn. | R. | A. |
|---|---|---|---|---|---|
| Rainy Mountain Boarding School | All | 13 | 6 N | 16 W | 640 |
| | All | 14 | 6 N | 16 W | 640 |
| | All | 23 | 6 N | 16 W | 640 |
| | All | 24 | 6 N | 16 W | 640. |

The government claims that this school tract, now occupied as a boarding or training school, either remained Indian country by virtue of some provision or reservation contained in the treaty and act of cession, or was made such by the executive order aforesaid.

It must be and is conceded that if this land is not Indian country, as spoken of in section 2148 of the Revised Statutes, upon which the petition is founded, then no cause of action is stated against the defendant. Indian country was first defined in the Act of June 30, 1834, c. 161, 4 Stat. 729. It was there declared:

"That all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be the Indian country."

Section 2148 is a substantial re-enactment of section 2 of the Act of August 18, 1856, c. 128, 11 Stat. 80, and was passed as a supplement to the act of 1834. So that, whatever was Indian country within the meaning of the act of 1834, was Indian country within the meaning of section 2148, as originally enacted. In Bates v. Clark, 95 U. S. 204–207, 24 L. Ed. 471, decided October 18, 1877, the Supreme Court had occasion to consider this definition of Indian country. It called attention to the fact that, notwithstanding immense changes had taken place in the vast region under contemplation by the act of 1834, nevertheless Congress had not thought it necessary to make any new definition of Indian country; that during that time a large body of laws had been in existence and confined to that country; that men had been punished by death, fine, and imprisonment in cases where the courts inflicting the punishment had no jurisdiction, if the offenses were not committed in the Indian country. The court says:

"These facts afford the strongest presumption that the Congress of the United States, and the judges who administered those laws, must have found in the definition of Indian country, in the act of 1834, such an adaptability to the altered circumstances of what was then Indian country as to enable them to ascertain what it was at any time since then. * * *

"If the section be read as describing * * * lands alone to which the Indian title has not been extinguished, we have a description of the Indian country which was good then, and which is good now, and which is capable of easy application at any time.

"The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

The Revised Statutes, while containing the substance of many of the important provisions of 1834, omitted all definition of Indian country. Referring to this omission, the Supreme Court, in Ex parte Crow Dog, 109 U. S. 556, 561, 3 Sup. Ct. 396, 399 (27 L. Ed. 1030), had this to say:

"Nevertheless, although the section of the act of 1834 containing the definition of that date has been repealed, it is not to be regarded as if it had never been adopted, but may be referred to in connection with the provisions of its original context which remain in force, and may be considered in connection with the changes which have taken place in our situation, with a view of determining from time to time what must be regarded as Indian country where it is spoken of in the statutes. It is an admitted rule in the interpretation of statutes that clauses which have been repealed may still be considered in construing the provisions that remain in force. * * *
"This definition, though not now expressed in the Revised Statutes, is implied in all those provisions, most of which were originally connected with it when first enacted, and which still refer to it. It would be otherwise impossible to explain these references, or give effect to many of the most important provisions of existing legislation for the government of Indian country."

And later in United States v. Le Bris, 121 U. S. 278, 280, 7 Sup. Ct. 894, 895 (30 L. Ed. 946):

"The repeal of this section does not of itself change the meaning of the term it defines when found elsewhere in the original connection. The re-enacted sections are to be given the same meaning they had in the original statute unless a contrary intention is plainly manifested."

The criterion established by Mr. Justice Miller in Bates v. Clark, supra, "which will always distinguish what is Indian country from what is not," has been steadfastly retained and many times restated by the Supreme Court; its last utterance being found in Clairmont v. United States, 225 U. S. 551, 558, 32 Sup. Ct. 787, 789 (56 L. Ed. 1201).

"It follows from this that all the country described by the act of 1834 as Indian country remains Indian country as long as the Indians retained their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress." Dick v. United States, 208 U. S. 340–359, 28 Sup. Ct. 399, 405 (52 L. Ed. 520).

It is to be noted that the land in question is within the territory described by the act of 1834 as Indian country, and section 2148 is one of the "provisions of its original context which remain in force." When the Kiowa, Comanche, and Apache tribes ceded this land to the United States, it ceased to be Indian country, unless by the treaty by which the Indians parted with their title, or by some act of authority, a different rule was made applicable to the case.

Was there any reservation, express or implied, incidental to the cession and relinquishment by these Indians by which their title to the lands in question was extinguished, that this or any other land conveyed should be devoted to these purposes? We can find none. The treaty of October 31, 1892, confirmed by act of Congress of June 6, 1900, specifies explicitly the conditions and considerations subject to which the conveyance and cession was made. They are the allotment of land in severalty, the setting apart of 480,000 acres as grazing land,

and the payment of $2,000,000 in the manner provided. For these considerations the Indians "ceded, conveyed, transferred, relinquished and surrendered forever and absolutely, without any reservation whatever, express or implied, all their claim, title and interest of every kind and character." It would be impossible to select words operating more completely to extinguish every vestige of Indian title, and releasing the government more absolutely from every obligation, moral as well as legal. In article 6 this purpose is made still more apparent. It is there said:

"As a further and only additional consideration for the cession of territory and relinquishment of title, claim, and interest in and to the lands as aforesaid," the United States agrees to pay the $2,000,000.

Nor do we find throughout the body of the act any provisions which operate to modify these positive and emphatic declarations. Article 3 has no bearing upon thirteenth sections, and, in any event, only operates to confirm allotments and title in third parties to land theretofore occupied for specific purposes. Article 11, which undertakes in terms to reserve certain sections for school purposes, contains no reservation for the benefit of the Indians, but rather for the territory and future state of Oklahoma. It may be conceded that if parts of the school sections thus allotted were lost to the state, it was duly reimbursed by lieu land granted. This is immaterial. The reservation of the lands in question vested the beneficial title either in the territory and future state or in the United States, but in neither case for Indian school purposes, nor as a continuance of any beneficial interest in the Indians.

The treaty with these Indians of 1867 (15 Stat. 581) contains no guaranty upon which can be founded a right carried forward and inferentially recognized in that of 1892, and the act of June 6, 1900. Article 7 of the former treaty, in which the United States agrees to provide a schoolhouse and a teacher competent to teach the elementary branches of an English education, for a period of not less than 20 years, is insufficient for such purpose and whatever obligation was thereby created expired by limitation long prior to these transactions. The common school contemplated by that section bears no resemblance to the institution established by the order of June 20, 1901. Furthermore, when Congress in the act of June 6, 1900, was expressly reciting all considerations moving and rights reserved to these Indians, and also making provision for schools and colleges for the territory and future state of Oklahoma, the omission of all reference to Indian schools is significantly exclusive. But counsel for the government contend that in default of treaty reservation, or act of Congress, nevertheless the character of this land as Indian country was restored by the executive order of the Interior Department above quoted. In re Wilson, 140 U. S. 575, 576, 11 Sup. Ct. 870, 35 L. Ed. 513, Spalding v. Chandler, 160 U. S. 394–403, 16 Sup. Ct. 360, 40 L. Ed. 469, and the General Allotment Act of February 8, 1887, c. 119, 24 Stat. 388, are cited as recognizing and conferring authority to create Indian reservations by executive order. In the Wilson Case suggested doubts as to the validity of such an order were put at rest by express legislative

recognition and ratification. In Spalding v. Chandler, the treaty, in terms, provided "that the United States would secure to the Indians a perpetual right of fishing and a place of encampment upon the tract ceded." We find it unnecessary, and therefore undesirable, to declare to what extent such authority has been lodged in the executive department; because we do not find any executive order in this case which operated to restore title to these Indians, and thereby to create Indian country within the meaning of the statutes employing that term.

The General Allotment Act provides:

"That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States, etc.," is authorized to allot the lands in said reservation in severalty.

The reservation of these lands for the Rainy Mountain Boarding School falls far short of creating a reservation for tribal use as contemplated by the allotment act; nothing short of express provision or plain implication could have that effect. The order in terms does not purport to make such a reservation. It undertakes to reserve certain public lands for agency, school, religious, and other public uses including the establishment of a boarding school for Indians. The public lands of the United States fall naturally under the jurisdiction of the Interior Department and matters affecting Indians to the Commissioner of Indian Affairs. That the order recites that it is made in accordance with the sixth section of the act of June 6, 1900, cannot enlarge the scope of that act.

The act of 1834 was entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." This title is significant, and it, together with the definition of Indian country there first laid down, indicates that the various provisions were enacted in recognition of the existence of a distinct line of demarcation between Indian country and that which was not Indian country. The Indians were considered in their tribal relation living apart as a people distinct from the white race. The Indian title necessary to stamp the land with the character of Indian country is merely a title and right to the perpetual occupancy of the land with the privilege of using it in such mode as they saw fit until such right of occupation has been surrendered to the government.

"When Indian reservations were created, either by treaty or executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated." Spalding v. Chandler, 160 U. S. 394, 403, 16 Sup. Ct. 360, 364 (40 L. Ed. 469).

In such case the government deals with the Indians practically as a foreign and distinct people with a distinct tribal organization recognized by the political department of the government, with substantial agrarian rights of use and occupancy which would only be terminated by treaty or act of Congress recognizing such property rights. Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299.

"Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the

members." Cherokee Nation v. Hitchcock, 187 U. S. 294–307, 23 Sup. Ct. 115, 120 (47 L. Ed. 183).

[2] Indian country, therefore, is, as conclusively appears from all the cases, a country to which the Indians retained the right of use and occupancy, involving—under certain restrictions—freedom of action and of enjoyment in their capacity as a distinct people, unless by virtue of some reservation expressed at the time of extinguishment of such title, and clearly appearing. In the absence of such, the term does not apply to any tract owned and controlled by the government and devoted by it, whether as a so-called reservation or mere foundation, to the benefit of the Indians, exclusively or otherwise, unattended by any semi-independent use and occupancy involving such title, ownership, and control as has always inhered in the Indians as a distinct people and not merely as individual wards. In re Lelah-Puc-Ka-Chee (D. C.) 98 Fed. 429–433; Benson v. United States (C. C.) 44 Fed. 178. Whether a reservation for any purpose affecting Indians is of a character sufficient to stamp such lands as Indian country within the meaning of the law must depend upon the scope and purpose of the act creating it, and the nature of the title, use, and occupancy, how held, exercised, and enjoyed. In United States v. Celestine, 215 U. S. 278, 285, 30 Sup. Ct. 93, 95 (54 L. Ed. 195), the Supreme Court said:

"The word 'reservation' has a different meaning, for while the body of land described in the section quoted as 'Indian country' was a reservation, yet a reservation is not necessarily 'Indian country.' The word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide."

It follows that this setting apart of a limited tract of the public domain for a school which the government devotes mainly, or even entirely, to the training and education of Indian children, attending in their individual capacity, could not operate to convert that tract into Indian country as defined in the statute invoked by plaintiff in error.

Many cases may be found which recognize the right of the government to preserve or extend the limits of Indian country, and the force of laws applicable thereto in the case of lands to which the Indian title has in other respects been extinguished (United States v. Forty-Three Gallons of Whiskey, 93 U. S. 188, 23 L. Ed. 846; Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520; Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750); others declare the right to prohibit the sale of liquor to Indians, who are wards of the government and in charge of Indian agents (Mosier v. United States, 198 Fed. 54, 117 C. C. A. 162; United States v. Holliday, 3 Wall. 407, 18 L. Ed. 182); and still others recognize the power of Congress under the commerce clause to prohibit shipments of liquor into what was formerly known as the Indian Territory (United States Express Co. v. Friedman et al., 191 Fed. 673, 112 C. C. A. 219; Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248). Nothing herein is in conflict with the views expressed in these cases. They serve largely to emphasize and confirm the distinctions we have drawn.

None of them either involve or support the contention that tracts such as this are Indian country, as defined in this statute.

The principles involved are similar to those discussed in Rainbow v. Young, 161 Fed. 835, 88 C. C. A. 653. There Judge (now Justice) Van Devanter, for this court, pointed out that the reservation from which Sloan was removed was the property of the United States, and in respect of it the United States had the right of an individual proprietor, could maintain its possession and deal with intruders in like manner as can an individual with respect to his property. The question of Indian country was not involved. The following section of the Revised Statutes was there under consideration:

"Sec. 2149. The Commissioner of Indian Affairs is authorized and required, with the approval of the Secretary of the Interior, to remove from any tribal reservation any person being thereon without authority of law, or whose presence within the limits of the reservation may, in the judgment of the commissioner, be detrimental to the peace and welfare of the Indians; and may employ for the purpose such force as may be necessary to enable the agent to effect the removal of such person."

In any event, there can be no doubt that the department and officials in charge can make and enforce ample regulations for the government of such properties and institutions; and Congress can pass laws imposing penalties upon trespassers and intruders.

We have before us a defendant in error upon whom the government seeks to impose a penalty provided in a statute highly penal. He can be charged only with an offense falling clearly within the terms of that act. Those terms should not be arbitrarily extended. This defendant cannot be punished under any strained construction made because it is conceived that public policy requires that acts, such as that with which he is charged, should be prohibited. There is no doubt that the government should have and does have complete control over these schools and over all dealings and intercourse with their inmates. But, as we have seen, Congress has ample power to provide all needed remedies, if, in fact, they do not already exist.

It follows that the judgment of the court below must be affirmed, And it is so ordered.