594 P.2d 798 (1979)
C.M.G., a juvenile, Appellant,
v.
The STATE of Oklahoma, Appellee.
No. J-78-362.
Court of Criminal Appeals of Oklahoma.
May 1, 1979.
As Corrected May 4, 1979.
Patti Palmer, Susan Work, Oklahoma City, for appellant.
Joseph A. Wideman, Dist. Atty., Kay County, Michael R. Collins, Alan B. Foster, Asst. Dist. Attys., for appellee.
F. Browning Pipestem, Norman, amicus curiae.

*799 OPINION
BRETT, Judge:
The juvenile, the State, and this Court agree that the threshold determination is whether or not the Chilocco Indian School (Chilocco) is "Indian country" within the definition of 18 U.S.C. § 1151 (1970).[1] If the school is Indian country, the United States has exclusive jurisdiction over prosecution of the offense. If it is not Indian country, then the State of Oklahoma and the United States have concurrent jurisdiction to prosecute the crime charged, and this Court must deal with the allegations of error in the certification proceedings.
Title 18 U.S.C. § 1151 (1970), provides that "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." Title 25 U.S.C. § 1321, ¶ (a), (1970), passed in 1968, grants to the states consent to assume, with the consent of the Indians involved, jurisdiction to prosecute crimes committed in Indian country, and 25 U.S.C. § 1323 (1970), gives the consent of the United States to states to amend their constitutions or existing statutes to remove any legal impediments to the state assuming that jurisdiction. To date, the State of Oklahoma had made no attempt to repeal Art. I, § 3, of the Constitution of the State of Oklahoma, which prohibits state jurisdiction over Indian country, so the federal government still has exclusive jurisdiction over Indian country located within Oklahoma boundaries. See State v. Littlechief, Okl.Cr., 573 P.2d 263 (1978).
The facts in this case are not in dispute. The parties stipulated that: (1) There are 266 in-state and out-of-state students enrolled at Chilocco, all of whom have at least one-quarter Indian blood. (2) Eighty-two of Chilocco's 102 employees are Indian. (3) Chilocco is not associated with any particular tribe, and its students are members of various tribes with which they maintain ongoing relationships. (4) Pursuant to employment contracts, Chilocco provides staff houses and apartments, all but three of which are occupied by Indian employees. (5) Chilocco is funded through the Bureau of Indian Affairs, an agency within the United States Department of the Interior. The administration of the funds is through the Anadarko Area Office, Bureau of Indian Affairs, Anadarko, Oklahoma. (6) While the Anadarko Agency administers funds to *800 Chilocco, the respective tribes and agencies are responsible for the welfare of the individual students who are subject to their authority, and the tribes and agencies provide financing for higher education and housing once the students leave the school. (7) There is an Indian health clinic located on the Chilocco campus. It is open three days a week and is operated by the United States Public Health Service in Pawnee, Oklahoma. The Pawnee Agency of the Bureau of Indian Affairs, located in Pawnee, approximately 70 to 75 miles from the school, provides service to the surrounding Indian community, including members of the Ponca, Pawnee, Otoe, Missouri, Kaw and Tonkawa tribes, but does not administer services to Chilocco, per se. (9) In 1934, an Indian Subsistence Homestead Colony was established on 3,000 acres of Chilocco Indian Reserve lands. It was divided into farms of about 160 acres and a common pasture of about 600 acres. (10) Houses and farm buildings for 15 homesteaders were erected for the Indian Subsistence Colony. (11) Participants in the Indian Subsistence Homestead Colony were required to sign an Indian subsistence homestead agreement with the federal government which provided that the buyer desired to become a member of the community and to occupy a homestead in the community. The agreement further provided for the use of common land and property by members of the community and required the participants to abide by applicable statutes and ordinances and administrative regulations. (12) As of 1957, six of the homesteads continued to be occupied by Indian homesteaders. Currently, none of the homesteads is occupied under the terms of the original agreement. (13) Non-Indians can be admitted and enrolled at Chilocco. (14) Legislation has been proposed to turn over the improvements of the homestead colony to the school, as the improvements have fallen into disuse, but it has not been acted upon.
The following other evidence appears. The Chilocco School Reserve is located in the northern strip of land in western Oklahoma which was commonly known as the Cherokee outlet. The Cherokee outlet was first acquired by the Cherokee Nation in the 1830's. In 1866, the United States and the Cherokee Nation agreed that:
"The United States may settle friendly Indians in any part of the Cherokee country west of 96°, to be taken in a compact form in quantity not exceeding one hundred and sixty acres for each member of each of said tribes thus to be settled; the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes to be held in common or by their members in severalty as the United States may decide." (Emphasis added) 14 Stat. 799, 804, Art. 16
Pursuant to the 1866 treaty, Poncas, Pawnees, Otoes and Missouri Indians were settled in portions of the Cherokee Outlet which were sold by the Cherokees.
In 1882, the Congress of the United States authorized an Indian school to be built in the Cherokee outlet near the southern boundary of the Kansas and near the Ponca and Pawnee reservations. 22 Stat. 68, 85, ch. 163. Thereafter, on July 12, 1884, President Chester A. Arthur issued an executive order setting aside land for the Chilocco Indian Reserve with these words:
"[T]he following-described tracts of country in the Indian Territory, viz, sections 13, 14, 15, 16, 21, 22, 23, 24, 25, 26, 27, 28, and the east half of sections 17, 20, and 29, all in township No. 29 north, range No. 2 east of the Indian meridian, be, and the same are hereby, reserved and set apart for the settlement of such friendly Indians belonging within the Indian Territory as have been or who may hereafter be educated at the Chilocco Indian Industrial School in said Territory." (Emphasis added) Kappler, Laws and Treaties, vol. 1, 842 (2nd ed.).
In 1891, the Cherokee Nation agreed to sell the entire Cherokee outlet to the United States. That agreement was ratified by Congress in 1893. 27 Stat. 612, 642, ch. 209. In Section 10 of that agreement, the United States agreed to purchase from the Cherokee Nation "all the right, title, interest, and claims ..." in the Cherokee outlet. *801 Further, the Cherokee Nation agreed to accept payment "as a full and complete relinquishment and extinguishment of all their title, claim, and interest in and to said lands; ..." However, the parties also agreed in Section 10 that:
"Sections thirteen, fourteen, fifteen sixteen, twenty-one, twenty-two, twenty-three, twenty-four, twenty-five, twenty-six, twenty-seven, twenty-eight and the east half of seventeen, twenty and twenty-nine, all in township numbered twenty-nine north, of range numbered two east of the Indian Meridian, the same being lands reserved by Executive order dated July twelfth eighteen hundred and eighty-four, for use of and in connection with the Chilocco Indian Industrial School, in the Indian Territory, shall not be subject to public settlement, but shall, until the further action of Congress, continue to be reserved for the purposes for which they were set apart in the said Executive order. . .." (Emphasis added)
It has become a truism in Indian law that doubtful expressions in Indian treaties and Acts of Congress dealing with Indians are to be resolved in favor of the Indians. DeCoteau v. District County Court for Tenth Jud. Dist., 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); McClanahan v. State Tax Commission of Arizona, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Choctaw Nation of Indians v. United States, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943). Cases in which land claimed to be Indian country was found not to be have involved land to which the Indians clearly and specifically had ceded all claim, right, title, and interest to the lands without any reservation whatsoever. See DeCoteau v. District County Court for Tenth Jud. Dist., supra; Ellis v. Page, 351 F.2d 250 (10th Cir.1965).
The definition of Indian country has developed over many years, and the present statutory definition of 18 U.S.C. § 1151 (1970), is a codification of prior case law. In Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), the United States Supreme Court rejected the contention that the term "Indian country" referred only to aboriginal lands of Indians and declared that lands which were set apart as Indian reservations out of the public domain were to be considered Indian country.[2] In United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), and United States v. McGowan, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), the United States Supreme Court held that dependent Indian communities were Indian country.[3] In United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed 676 (1914), the Supreme Court held that Indian allotments were Indian country.[4]
Obviously, the land in question is not an allotment, and we can agree with the State that the property is not a diminished reservation of the old Cherokee Outlet.[5] See United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909). In light of the clear language of the treaty ratification, we cannot say, nor does the juvenile contend, that the Cherokee Nation retains any legal interest in Chilocco. That leaves only the question of whether Chilocco is a dependent Indian community.
The State cites the Eighth Circuit case of United States v. Myers, 206 F. 387 (8th Cir.1913), for the proposition that Indian schools are not "Indian country." In that case, however, the school was located on land which had been reserved from land sold by the Kiowa, Comanche and Apache tribes of Indians "for the use of the common schools, [and] for university, agricultural colleges, normal schools, and public buildings of the territory and future state of Oklahoma; ..." As the Court pointed out, there was not a reservation for the benefit of Indians, but for the benefit *802 of the territory and future state of Oklahoma. According to the Court, Indian country is "country to which the Indians retained the right of use and occupancy, involving  under certain restrictions  freedom of action and of enjoyment in their capacity as a distinct people, unless by virtue of some reservation expressed at the time of extinguishment of such title, and clearly appearing... ." supra at 394. Citing United States v. Celestine, supra, the Court said that in order to determine whether land was Indian country, one must look at "the scope and purpose of the act creating it, and the nature of the title, use, and occupancy, how held, exercised, and enjoyed." supra at 394. We need not determine whether Myers would be decided the same today as it was in 1913; it is sufficient to point out that the land in Myers, while it was used as an Indian school, had not been reserved for the use of Indians when it was acquired by the United States, as was the land in the instant case. Therefore, Myers does not stand for the proposition that Indian schools are not Indian country.
Furthermore, we cannot agree with the State's contention that as the Cherokee Nation reserved no interest in the land in question, it cannot be considered Indian country. Looking at the cases in which it has been found that there is a dependent Indian community, and therefore "Indian country," we find that Indian country need not inure to the benefit of a single tribe, or of named tribes; nor need title to the land remain with the Indians who are to benefit from its use. In United States v. McGowan, supra, the Reno Indian Colony was located on 28.3 acres of land owned by the United States and purchased out of funds appropriated by Congress. The congressional purpose of the purchase was to "provide lands for needy Indians scattered over the State of Nevada, and to equip and supervise these Indians in establishing a permanent settlement." In that case, the Supreme Court said that the designation given to a community was immaterial; whether it was called a colony or a reservation, it was still Indian country.
Quoting United States v. Pelican, supra, 232 U.S. at 449, 34 S.Ct. at 399, the Court said that the community was Indian country "simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the government." In the present case, the land in question was set aside by Congress for "the settlement of friendly Indians," and the arguments of the State to the contrary, the United States could not change the use of the land to, for example, a military reservation without at least an act of Congress.
Looking at other cases which deal with the definition of Indian country, we find in United States v. Martine, 442 F.2d 1022 (10th Cir.1971), that the Court looked at "the nature of the area in question, the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area...."
In United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975), the Court found that a bar operated by non-Indian defendants on non-Indian land on the outskirts of an unincorporated village within an Indian reservation was Indian country. The Court considered that the bar was located on the outskirts of Fort Washakie, Wyoming, where the Wind River Agency of the Bureau of Indian Affairs the tribal headquarters of the Wind River Tribes were located. Of the 212 families living within a 20 square mile area, 170 were Indian, 41 were non-Indian, and one was mixed. The state school serving Fort Washakie had a total enrollment of 243 students, 223 of whom were Indian. The bar served both Indians and non-Indians, and the lands on which the bar was located were held in fee by non-Indians.
In the instant case, the land in question is owned by the United States. All the students are Indian, as are most of the employees of the school. The employees' salaries and the students' tuition are paid for by the Bureau of Indian Affairs. The fact that the Indian subsistence homestead community, *803 which was started in 1934, was not a success, does not change the fact that the land in question had been reserved by Congress for an Indian school and for "the settlement of such friendly Indians belonging within the Indian Territory as have been or who may hereafter be educated at the Chilocco Indian Industrial School in said Territory." The land was set aside for that purpose by an executive order, that purpose was incorporated in the 1891 treaty between the Cherokee Nation and the United States, and that incorporation was ratified in 1893 by the United States Congress.
One of the United States Supreme Court's latest statements on the definition of Indian country is found in United States v. John, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978), in which the Court once more cited with approval the McGowan case, supra, 302 U.S. at 538, 58 S.Ct. at 287, for the proposition that in determining what was Indian country, one looked to see that the "fundamental consideration of both Congress and the Department of the Interior ... has been the protection of a dependent people." The Court in John reiterated the test set out in Pelican, supra, 302 U.S. at 539, and followed in McGowan, supra, 232 U.S. at 449, 34 S.Ct. at 399, that it must be determined whether the land in question "had been validly set apart for the use of the Indians as such, under the superintendence of the government."
Looking at the historical background of the land in question in the John case, in 1830 the Choctaw Indians and the United States signed a treaty providing that the Choctaws would cede to the United States all lands still occupied by them east of the Mississippi. The agreement also provided for a method by which Choctaws who wished to remain in Mississippi could receive allotments of land. Many Choctaws remained in Mississippi, and in 1918 Congress passed an appropriation bill which included funds for an agency to provide medical care for the Choctaws remaining in Mississippi, for the maintenance for schools, and for the purchase of land and farm equipment. In the 1930's, the federal government discontinued the allotment program, and in 1939 Congress passed an act providing that title to all the land previously purchased for the Mississippi Choctaws would be "in the United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior." In 1944, the Assistant Secretary of the Department of the Interior officially declared these lands in question to be a reservation.
According to the United States Supreme Court, there was no reason why the land which had been purchased for the Mississippi Choctaw Indians had not become a reservation at the time it was declared by Congress to be held in trust by the United States for the benefit of those Indians. However, if there were any question about the land being a reservation, it was completely clarified by the 1944 proclamation stating that the land was a reservation.
The Court stressed that the land was Indian country, even if it were true, as the State of Mississippi argued, that the Choctaws residing in Mississippi had become fully assimilated into the political and social life of Mississippi, that the United States had abandoned its supervisory authority over the Mississippi Choctaws, and that for some time Mississippi's jurisdiction over that land had gone unchallenged. The land was, and had been, Indian country, and Mississippi had never had criminal jurisdiction there. We think John, therefore, disposes of the State's suggestion that the State of Oklahoma has jurisdiction over crimes that occur at Chilocco, because the United States has elected not to prosecute them.
Finally, there is the case of Sac & Fox Tribe of Mississippi in Iowa v. Licklider, 576 F.2d 145 (8th Cir.1978). That case showed that in 1842 the Sac and Fox Tribe ceded all its land west of the Mississippi to the United States and agreed to move to a reservation in Kansas. Some members of the Fox Tribe and of the Sac Tribe returned to Iowa, and in 1856 the Iowa Legislature consented to their continued residence. In *804 1857, the tribes purchased a small tract of land, and title was taken by the Governor of Iowa in trust for them. In 1865, the federal government sent an Indian agent to Iowa to supervise the tribe, and in 1867 Congress approved the payment of treaty annuities to the tribe in Iowa. Starting at least as early as 1874, the Bureau of Indian Affairs spent money for the education of members of the tribes in Iowa and constructed a boarding school in Toledo, Iowa. In 1896, the United States accepted and assumed jurisdiction over the Sac and Fox Indians in Iowa. Since 1896, the Bureau of Indian Affairs has spent funds for social services, land management, employment assistance, health services, and police services, and education for the tribes. Finding that the area was Indian country, the Eighth Circuit said that there had been a "de facto reservation" there since as early as 1865.
In the instant case, there is a tract of land which was specifically reserved for the settlement of friendly Indians at the time the Cherokee outlet was ceded to the United States. Therefore, we must say that Chilocco meets the definition of a dependent Indian community and that the State of Oklahoma has no jurisdiction over crimes committed there. We make this holding reluctantly, but, as the Supreme Court stated in United States v. Celestine, supra, 215 U.S. at 290, 30 S.Ct. at 97, . . "[I]t is for Congress to determine when and how that relationship of [national] guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress... ." As the Supreme Court stated more recently in DeCoteau v. District County Court for Tenth Jud. Dist., supra, 420 U.S. at 450, 95 S.Ct. at 1095, "Congress and the tribe spoke clearly. Some might wish they had spoken differently, but we cannot remake history."
As we find that the State of Oklahoma has no jurisdiction to prosecute crimes which occur at Chilocco, the certification proceedings in this case were void ab initio, and we will not consider any errors alleged to have occurred in those proceedings. Accordingly, we REVERSE and REMAND this case with instructions to DISMISS.
CORNISH, P.J., and BUSSEY, J., concur.
NOTES
[1] Title 18 U.S.C. § 1151 (1970), reads as follows:

"Except as otherwise provided in sections 1154 and 1156 of this title, the term `Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. June 25, 1948, c. 645, 62 Stat. 757; May 24, 1949, c. 139, § 25, 63 Stat. 94."
[2] Codified in 18 U.S.C. § 1151(a) (1970).
[3] Codified in 18 U.S.C. § 1151(b) (1970).
[4] Codified in 18 U.S.C. § 1151(c) (1970).
[5] We do note, however, that the land was referred to by the United States Supreme Court in Winebrenner v. Forney, 189 U.S. 148, 23 S.Ct. 590, 47 L.Ed. 754 (1903), as the Chilocco Reservation.