**Tommy Mongrain EAVES, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–87–351.

Court of Criminal Appeals of Oklahoma.

June 29, 1990.

Rehearing Denied Sept. 7, 1990.

E. Alvin Schay, Appellate Public Defender, Norman, for appellant.

Robert H. Henry, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Lee S. McIntire, Legal Intern, Oklahoma City, for appellee.

OPINION

LUMPKIN, Judge:

Appellant Tommy Mongrain Eaves was tried by jury in the District Court of Osage County, Case No. CRF–85–65, for First Degree Murder (21 O.S.Supp.1982, § 701.7). The jury returned a guilty verdict for Second Degree Murder (21 O.S.1981, § 701.8) and recommended a punishment of thirty (30) years imprisonment. The trial court sentenced accordingly. From this judgment and sentence, Appellant appeals. We affirm.

The Appellant, an Osage Indian, shot and killed his father, also an Osage Indian, in Pawhuska, Oklahoma. The crime occurred in a housing project owned by the Osage Tribal Housing Authority. In his sole assignment of error, Appellant contends that the offense occurred on Indian country, outside the jurisdiction of the State court. Indian country is defined in 18 U.S.C. § 1151 and includes Indian reservations, dependent Indian communities and all Indian allotments. Both the State and the Appellant agree that the location of the crime was neither an Indian reservation nor an allotment. The dispositive question is whether the area was a dependent Indian community.

In *C.M.G. v. State*, 594 P.2d 798 (Okl.Cr. 1979) *cert. denied* 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 421 (1979), this Court was faced with the question of the state's jurisdiction to prosecute crimes at the Chilocco Indian School. In holding that the state lacked jurisdiction, the Court provided a thorough discussion of the law of dependent Indian communities. Since *C.M.G.* was handed down in 1979, the First and Eighth Circuit Courts of Appeal have had occasion to further address the issue. These courts

have concluded that Section 1151 mandates an inquiry into the nature of the community in which the crime occurred, the ultimate issue being whether the evidence shows that the area was established for the use, occupancy and protection of dependent Indians. *United States v. Levesque*, 681 F.2d 75 (1st Cir.1982); *cert. denied* 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982), *United States v. South Dakota*, 665 F.2d 837 (8th Cir.1981); *cert. denied* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982), *Weddell v. Meierhenry*, 636 F.2d 211 (8th Cir.1980) *cert. denied* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981). *See also United States v. Mound*, 477 F.Supp. 156 (D.S.D.1979). These courts have also agreed that the test for determining what is a dependent Indian community must be a flexible one, not tied to any single technical standard. *United States v. South Dakota*, 665 F.2d at 842.

In the present case, the parties stipulated that the land was originally Osage Tribal land allotted to an Osage Indian. The land was subsequently sold to a non-Indian who in turn sold it to the Osage Tribal Council Housing Authority. The parties also stipulated to information contained in the Cooperation Agreement between the Housing Authority and the City of Pawhuska. The cooperation agreement provided that initial funding for the housing project came from the federal government, Department of Housing and Urban Development, (HUD); title to the land is held by the Housing Authority; the city of Pawhuska is to provide all public services including police and fire protection, water, sanitation, sewer, electricity and road maintenance; and an annual payment in lieu of taxes is to be paid by the Housing Authority to the city of Pawhuska. Evidence was also presented which showed that ninety (90%) percent of the residents of the housing project are Indian, Indians have federally approved first priority for housing, the Indian Health Service (IHS) installed the water and sewer lines, and the children attend Pawhuska schools, with the assistance of federal funds under the Johnson–

O'Malley Act, 26 U.S.C. 452, to be used in educating Indian children.

Appellant argues that all of the above constitute a dependent Indian community, citing as authority *United States v. South Dakota.* In that case, the Eighth Circuit held that a housing project located in the city of Sisseton, South Dakota fell within the meaning of a dependent Indian community and the state was therefore prohibited from exercising jurisdiction. In arriving at that decision, the court specifically considered the nature of the area in question, the relationship of the residents of the project to the Tribe and the federal government, the establishment and practice of government agencies toward the area, and the cohesiveness of the community. Although the housing project was funded and operated in much the same way as the project in the present case, the ownership of the land and the establishment and operation of the Housing Authority are important factors which distinguish the *South Dakota* case from the instant case.

In *South Dakota*, the housing project was originally located within the boundaries of an Indian Reservation. The Reservation was terminated in 1891 and all non-Indian lands were returned to the public domain. This particular parcel was never an Indian allotment, but was instead sold by the United States. The land eventually came into the possession of a church which transferred it to the United States in trust for the Sisseton–Wahpeton Sioux Tribe by warranty deed. The deed contained a condition that the land be exclusively used for a low rent housing project. The housing project originated under a Tribal Ordinance enacted pursuant to the Tribe's authority to provide for the health, safety and welfare of the Tribe. By this act, the Tribe created the Housing Authority whose stated purpose was to remedy the reservation problems of unsafe and unsanitary housing conditions. The land was leased by the Tribe to the Tribal Housing Authority for the purpose of constructing and operating a low rent housing project.

■ In the present case, the original allotment was sold to a non-Indian who in-turn sold it to the Osage Tribal Housing Authority. The Housing Authority was created by the Oklahoma Housing Authority Act, 63 O.S.1981, § 1057, which provides in pertinent part:

> There is hereby created, with respect to each Indian tribe, band or nation in the state, a **public body corporate and politic, to function in the operating area of such Indian tribe, band, or nation to be known as the "housing authority" of said Indian tribe, band, or nation, which shall be an agency of the State of Oklahoma,** possessing all powers rights, and functions herein specified for city and county authorities created pursuant to this act: Provided that said Indian housing authority shall not transact any business nor exercise its powers hereunder until or unless the governing council of said tribe, band or nation as the case may be, by proper resolution, declares that there is a need for an authority to function for said tribe, band or nation. (Emphasis added)

This section clearly states that the tribal housing authority is a state agency. In *Housing Authority of the Choctaw Nation v. Craytor*, 600 P.2d 314 (Okl.1979), the Oklahoma State Supreme Court held the tribal housing authorities created by Section 1057 to be state agencies subject to the jurisdiction of the state courts. We agree with this interpretation of Section 1057 and find that the tribal housing authorities created pursuant to that statute are state agencies subject to jurisdiction of the state courts. Therefore, as the Housing Authority is subject to state jurisdiction, land owned by the Authority is also subject to state jurisdiction.

Although the ownership of the situs of the crime by a state agency is a factor which distinguishes the present case, there are other factors to be considered before a determination is made whether the project is a dependent Indian community. These factors include the fact that the State of Oklahoma and the City of Pawhuska have considered the project to be under their jurisdiction since its origin. The state and city have provided all essential services.

The federal government has merely subsidized selective programs. The Tribal Council has never formed a court or enacted a code or ordinances to provide for criminal prosecution. The federal prosecutor has never attempted to exercise jurisdiction, believing the housing authority to be under state jurisdiction. Although each of these considerations alone may not be sufficient to defeat a finding of a dependent Indian community, *United States v. South Dakota*, 665 F.2d at 842; considering the evidence as a whole, we find that the housing project owned by the Osage Tribal Housing Authority is not a dependent Indian community within the meaning of 18 U.S.C. § 1151. *See United States v. Martine*, 442 F.2d 1022 (10th Cir.1971). Therefore, the trial court properly ruled that the State had jurisdiction to prosecute the Appellant for a criminal offense which occurred in the housing project. Accordingly, this assignment of error is denied.

For the foregoing reasons, the judgment and sentence is AFFIRMED.

PARKS, P.J., and JOHNSON, J., concur.

BRETT, J., concurs in result.

LANE, V.P.J., dissents.

LANE, Vice Presiding Judge, dissenting:

I dissent because 63 O.S.1981, § 1057 is designed for the benefit of Indian tribes and not for the purpose of bringing Indians under state jurisdiction when they would not otherwise be so. The statute is drafted to comply with the Department of Health and Urban Development (HUD) regulations to fund housing for low-income tribal families. The peculiar nature of the statute is that it provides the only way for the tribes to obtain the federal funds.

It has long been known that Congress has plenary power over Indians and Indian activities by virtue of the Indian commerce clause and supremacy clause of the United States Constitution. States may exercise authority over Indian Country only with the explicit consent of Congress. *C.M.G. v. State of Oklahoma*, 594 P.2d 798, 799 (Okl.

Cr.1979) *cert. denied*, 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 421 (1979); *Ahboah v. Housing Authority of Kiowa Tribe*, 660 P.2d 625, 629 (Okl.1983); *State v. Littlechief*, 573 P.2d 263, 264 (Okl.Cr.1978).

An Indian Housing Authority is defined as follows:

A public nonprofit corporation established by state law to undertake a program of low rent/mutual help housing for low-income families of the tribal community. The Indian Housing Authority acts as a separate entity that should work closely with tribal, BIA or other community improvement organizations involved in providing better housing for low-income families, eliminating substandard housing and uplifting and encouraging self-improvement of the tribal community's low-income families. An Indian Housing Authority operates under a financial assistance contract (ACC) with the Department of Housing and Urban Development, a federal agency, and works closely with the Tribal Governing Body in the planning and development of the Housing program. (O.R. 34). *Also, see* 24 C.F.R. § 905.101 *et seq.* (1988).

63 O.S.1981, § 1057 applies exclusively to the creation of Indian Housing Authorities and is separate and distinct from the statute creating non-Indian housing authorities. The sole beneficiaries of § 1057 are Indians. The statute was created pursuant to the federal HUD guidelines which sets forth in detail the procedures to qualify the housing authority for HUD funding. The Housing Authority is an extension of the tribe because the power of the housing authority is vested in the tribe. The state statute specifies that the authority shall not transact any business nor exercise powers without the tribe formally requesting such. The tribal chief or governing head of the tribe is authorized to exercise all appointing and other powers with respect to the housing authority.

The principle test for Indian country is taken from *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), and is whether the land in question "had been validly set apart for the use of the

Indians as such, under the superintendence of the Government." *Id.* at 449, 34 S.Ct. at 399; 302 U.S. at 439, 58 S.Ct. at 288. Applying the *Pelican* test to the instant case, the housing project qualifies as Indian country for the following reasons. The Housing Authority project was federally funded by HUD. Funding included purchase of the land, construction of the houses, and putting in the utility lines. The Indian Health Services used federal funds for putting in the water mains and the sewer system and tied the system into the City of Pawhuska's main sewer and water lines.

Congress provided the framework and the funding for the purpose of protection of a dependent people by providing homes for needy Indian people. The language of the state statute indicates the Indian tribes are to be the primary beneficiaries of the statute. The agreement between the Housing Authority and HUD requires the Osage Tribal members be given first preference as applicants for homes and members of other Indian tribes be given second preference and only then can the homes be made available to non-Indians. Approximately 90% of the people who have homes in the housing addition are Indian.

The majority asserts that because "the Housing Authority is subject to state jurisdiction, land owned by the Authority is also subject to state jurisdiction." The majority incorrectly relies on *Housing Authority of Choctaw Nation v. Craytor*, 600 P.2d 314, (Okl.1979) as authority for asserting state jurisdiction based on the state agency relationship. The majority is misreading *Craytor*. *Craytor* stands for the proposition that Housing Authority matters, such as the selection of commissioners, are governed by state jurisdiction because the Housing Authority derived its power to appoint commissioners from the state. Whether the land is Indian country is not a Housing Authority matter, and in no way may the statute extend to encompass criminal jurisdiction occurring within Indian country. Subject matter jurisdiction over the criminal act of murder is clearly preempted by federal statutes, §§ 1151 and 1153.

The majority points to the fact that the state and city have provided all essential services. Federal law requires that HUD projects reach cooperation agreements with local governments to obtain the basic governmental services to maintain the project. *United States v. South Dakota,* 665 F.2d 837, 840 (8th Cir.1981) *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982). Reimbursement for these services are made through payments in lieu of taxes (PILOT). *Id.* Services provided by the City of Pawhuska are provided under such a cooperation agreement. Additionally, even though the Indian children attend public schools, the Johnson O'Malley Act federal funds are used for the purpose of schooling the Indians that are involved in that particular area.

For the above reasons, the land in question owned by the Housing Authority of the Osage Tribe of Indians in Oklahoma meets the definition of a dependent Indian community and the State of Oklahoma has no jurisdiction over crimes committed there.