2005 OK CR 25

**Patrick Dwayne MURPHY, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. PCD–2004–321.

Court of Criminal Appeals of Oklahoma.

Dec. 7, 2005.

Gary Peterson, Kari Y. Hawkins, Oklahoma City, OK, for petitioner on appeal.

W.A., Drew Edmondson, Attorney General of Oklahoma, Preston Saul Draper, Assistant Attorney General, Oklahoma City, OK, for the State on appeal.

## OPINION GRANTING IN PART PETITIONER'S APPLICATION FOR POST–CONVICTION RELIEF

LUMPKIN, Vice–Presiding Judge.

¶ 1 Petitioner Patrick Dwayne Murphy was convicted of First Degree Murder in McIntosh County District Court case no. CF–1999–164A and sentenced to death. He appealed his conviction in case no. D–2000–705. We affirmed his conviction and sentence. *Murphy v. State,* 2002 OK CR 24, 47 P.3d 876. Petitioner then applied for post-conviction relief, but was denied. *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556 (resolving all claims, except mental retardation); *Murphy v. State,* 2003 OK CR 6, 66 P.3d 456 (denying mental retardation claim).

¶ 2 Petitioner filed his second post-conviction application, raising three issues. We remanded the matter to the District Court for an evidentiary hearing on his first claim, relating to jurisdiction. That hearing was held in December of 2004. The parties have since submitted supplemental briefs on the issues adjudicated therein. The last brief was submitted by the State on February 2, 2005.

¶ 3 On numerous occasions this Court has set forth the narrow scope of review available under the amended Post–Conviction Procedure Act. *See e.g., McCarty v. State,* 1999 OK CR 24, ¶ 4, 989 P.2d 990, 993, *cert. denied,* 528 U.S. 1009, 120 S.Ct. 509, 145 L.Ed.2d 394 (1999). The Post–Conviction Procedure Act was neither designed nor intended to provide applicants another direct appeal. *Walker v. State,* 1997 OK CR 3, ¶ 3, 933 P.2d 327, 330, *cert. denied,* 521 U.S. 1125, 117 S.Ct. 2524, 138 L.Ed.2d 1024 (interpreting Act as amended). The Act has always provided petitioners with very limited grounds upon which to base a collateral attack on their judgments. Accordingly, claims that could have been raised in previous appeals but were not are generally waived; claims raised on direct appeal are *res judicata.* *Thomas v. State,* 1994 OK CR 85, ¶ 3, 888 P.2d 522, 525, *cert. denied,* 516 U.S. 840, 116 S.Ct. 123, 133 L.Ed.2d 73 (1995).

¶ 4 The new Act makes it more difficult for capital post-conviction applicants to avoid procedural bars. *Walker*, 1997 OK CR 3, ¶ 4, 933 P.2d at 331. Under 22 O.S.2001, § 1089(C)(1), only claims that "[w]ere not and could not have been raised" on direct appeal will be considered. A capital post-conviction claim could not have been raised on direct appeal if: (1) it is an ineffective assistance of trial or appellate counsel claim which meets the statute's definition of ineffective counsel; or (2) the legal basis of the claim was not recognized or could not have been reasonably formulated from a decision of the United States Supreme Court, a federal appellate court, or an appellate court of this State, or is a new rule of constitutional law given retroactive effect by the Supreme Court or an appellate court of this State. 22 O.S.2001, §§ 1089(D)(4)(b), 1089(D)(9).

¶ 5 Should a Petitioner meet this burden, this Court shall consider the claim only if it "[s]upport(s) a conclusion either that the outcome of the trial would have been different but for the errors or that the defendant is factually innocent." 12 O.S.Supp.2001, § 1089(C)(2). As we said in *Walker*:

> The amendments to the capital post-conviction review statute reflect the legislature's intent to honor and preserve the legal principle of finality of judgment, and we will narrowly construe these amendments to effectuate that intent. Given the newly refined and limited review afforded capital post-conviction applicants, we must also emphasize the importance of direct appeal as the mechanism for raising all potentially meritorious claims. Because the direct appeal provides appellants their only opportunity to have this Court fully review *all* claims of error which might arguably warrant relief, we urge them to raise all such claims at that juncture.

*Walker*, 1997 OK CR 3, ¶ 5, 933 P.2d at 331 (omitted, emphasis in original). We now turn to Petitioner's claims.

¶ 6 In proposition one, Petitioner raises, for the first time, a jurisdictional issue. Petitioner claims that he and the victim are Indians and that the crime occurred in Indian country. Thus Petitioner claims jurisdiction is exclusively federal under 18 U.S.C. § 1153. As such, he claims his state court proceedings are void and that he should be immediately released from the State's custody.

¶ 7 The crucial issue here is decidedly simple, yet remarkably difficult to resolve. The record reflects Petitioner is an enrolled member of the Muscogee (Creek) Nation, as was the victim, George Jacobs. Both are "Indians" for purpose of 18 U.S.C. § 1153,[1] as both sides readily admit.

¶ 8 The decisive issue, then, is whether or not the crime occurred in "Indian country," [2] for if it did Oklahoma has no jurisdiction over the crime. *See Cravatt v. State*, 1992 OK CR 6, ¶ 7, 825 P.2d 277, 280 (murder prosecutions in Indian country have been "specifically reserved to the United States"); *State v. Klindt*, 1989 OK CR 75, ¶ 3, 782 P.2d 401, 403 ("Oklahoma does not have jurisdiction over crimes committed by or against an Indian in Indian Country.").

¶ 9 The issue is fairly fact intensive at first, for we must pinpoint where exactly the crime occurred. But then, the matter becomes primarily legal, involving the definition of Indian country under federal law.

¶ 10 18 U.S.C. § 1151 has three categories of Indian country: Indian reservations; dependent Indian communities; and Indian allotments, the Indian titles to which have not been extinguished. *Eaves v. State*, 1990 OK CR 42, ¶ 2, 795 P.2d 1060, 1061. Petitioner's

---

1. "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder ... within the Indian Country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

2. "Indian Country" is defined as: "(a) all land within the limits of *any Indian reservation* under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation, (b) all *dependent Indian communities* within the borders of the United States whether within the original or subsequently acquired territory thereof, whether within or without the limits of a state, and (c) all *Indian allotments, the Indian titles to which have not been extinguished,* including rights-of-way running through the same." 18 U.S.C. § 1151 (emphasis added).

claim falls primarily under subsection (c), Indian allotments, although he also presented evidence that the area was part of a Creek reservation and a dependent Indian community.

¶ 11 We were sufficiently concerned about the factual and legal merits of this claim to remand the matter to the McIntosh County District Court for an evidentiary hearing.[3] This Court does not remand for evidentiary hearings on a whim. An application for evidentiary hearing and supporting affidavits "must contain sufficient information to show this Court by clear and convincing evidence the materials sought to be introduced have or are likely to have support in law and fact to be relevant to an allegation raised in the application for post-conviction relief." Rule 9.7(D)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2004). Thereafter, if this Court determines "the requirements of Section 1089(D) of Title 22 have been met and issues of fact must be resolved by the District Court, it shall issue an order remanding to the District Court for an evidentiary hearing." Rule 9.7(D)(6), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2004).

¶ 12 At the evidentiary hearing, the parties presented diametrically opposed positions concerning whether or not the crime occurred in Indian country.

¶ 13 The State argued the crime occurred on a county road owned by the State of Oklahoma, a road that was never made a part of an Indian allotment and that is currently maintained by McIntosh County. Alternatively, the State argued that, should this Court find the title to the road was part of a former Creek Nation allotment, the Indian title thereto has been extinguished by prior conveyances from Creek allottees to non-Indians.

¶ 14 Petitioner, however, claimed the county road was an easement or right-of-way and that fee title to the land beneath that road was owned by a Creek allottee, not the State. The surface rights had since been conveyed away, but the allottee's heirs had maintained a mineral interest. Petitioner thus claimed the Indian title to the property had not been fully extinguished as required by federal statute and for that reason the whole tract remains Indian country.[4]

¶ 15 This issue—i.e., whether the conveyance of all surface rights to an Indian country allotment extinguishes the Indian title thereto, or whether the reservation of a small mineral interest (1/12th) by the Creek Indian allottees preserves the Indian title so that criminal jurisdiction remains federal—appears to be novel. The parties have submitted numerous cases that are, to varying degrees, relevant to the crucial issue and somewhat analogous on certain points. But none of the cases deal directly with the issue presented here.

¶ 16 We are thus left interpreting federal statutes, federal decisions, and state cases construing federal law in an attempt to resolve a matter of utmost importance: who has jurisdiction over the murder of George Jacobs?

¶ 17 The evidentiary hearing lasted one day. Following the hearing the Associate District Judge made findings of fact and conclusions of law.

¶ 18 As for the facts, the District Court found: the fatal wound (amputation of the victim's genitals) was inflicted while the victim was on the traveled portion of Vernon Road; the victim died in the ditch just off the east edge of Vernon Road, after his attackers dragged him there; all of Vernon Road, including the ditch where the victim was found, lies within a three rod area granted to the

---

3. The hearing addressed the following issues: (1) Where exactly did the crime occur? (2) Who "owns" title to the property upon which the crime occurred? (3) If some or all of the crime occurred on an easement, how does that factor into the ownership question? (4) How much of the crime occurred, if any, on an easement? (5) Did the crime occur in "Indian County," as defined by 18 U.S.C. § 1151? (6) Is jurisdiction over the crime exclusively federal?

4. The District Court did not admit any of Petitioner's evidence pertaining to the issue of a "dependent Indian community." This was error. Fortunately, however, Petitioner made an offer of proof and submitted substantial materials on this issue, as we discuss below.

public for highway purposes by the Supplemental Creek Agreement of 1902;[5] 100 % of the surface and 11/12ths of the minerals to the tract of land adjacent to and directly east of the crime scene is wholly unrestricted property, owned by non-Indians; and the remaining 1/12th mineral interest appears to be a restricted interest retained by Indian heirs of a Creek allottee.

¶ 19 The District Court's legal conclusions were as follows: Vernon Road lies on land ceded to the State, not an easement; the original Creek allottees took their land subject to the grant for a public highway; thus the land upon which the road lies was not part of the allotment; the State of Oklahoma owns title to the property on which the crime occurred; the crime did not occur in Indian country; assuming, *arguendo*, that Vernon Road does lie on an easement, said easement is perpetual and therefore not Indian country; assuming, *arguendo*, that the land under Vernon Road was conveyed to the Creek Indian allottees, the Indian title thereto has since been extinguished, as only a 1/12th mineral interest continues to be owned by Creek Indians; and criminal jurisdiction thus lies with the State pursuant to the reasoning of *Cravatt v. State.*

¶ 20 We agree with many of the District Court's findings and conclusions. But we cannot find factual or legal support for them all.

¶ 21 We readily accept the District Court's findings as to the source of the fatal wound and where it was inflicted. For jurisdictional purposes, the crime took place on both the northbound lane of Vernon Road (i.e., the road's eastern side in the N/2 SW/4 and the S/2 NW/4 of Section 27, Township 9 North, Range 13 East, McIntosh County) and the adjacent ditch. Plus, as the parties and District Court agree, both sites (the site of the fatal wound and the ditch where George Jacobs died) are within the boundaries of the

three-rod (49.5 feet) area created along the section line by a 1902 Creek Nation Treaty with the United States. *See* Act of June 30, 1902, 32 Stat. 500, 502, § 10.

¶ 22 However, the record does not support the District Court's finding that the area in question lies on land that was "ceded to the State." We find the record, witness testimony, treaty language, and relevant cases all support a finding that the State of Oklahoma's interest in the area in question is in the nature of an easement or right-of way.[6]

¶ 23 The June 30, 1902 Act, which ratified an agreement between the United States and the Creek Nation, provided, in Paragraph 10, that "Public highways or roads 3 rods in width, being 1 and one-half rods on each side of the section line, may be established along all section lines without any compensation being paid therefor; and all allottees, purchasers, and others *shall take the title to such lands subject to this provision.*" (emphasis added). The language gives no indication that Oklahoma, which became a state in 1907, was granted fee simple title to the strip in question.

¶ 24 Prior to the passage of this Act, the Creek Nation already owned this same land in fee, as those lands had been long ago granted by the United States to the Creek Nation in exchange for the Creek's agreement to cede their land in Alabama and Georgia. *See Indian Country, U.S.A. v. State of Oklahoma*, 829 F.2d 967, 971 (10th Cir.1987). Even in 1890 when the Creek Nation's lands became part of what became Oklahoma Territory—the land reserved for the Five Civilized Tribes—the Creek's property remained Indian country owned in fee. *Id.* at 974, 977. When the lands were subsequently allotted to Creek Indians as per the Creek Allotment Act in 1901, "Congress was careful to preserve the authority of the government of the United States over the Indi-

---

**5.** 32 Stat. 500, 502.

**6.** This Court is not typically in the business of resolving title matters pertaining to Oklahoma property. Due to Oklahoma's unique appellate court system, which places authority for resolving civil matters with the Oklahoma Supreme Court and criminal matters with this Court, mat-

ters of this type, i.e., who owns title to the strip of land upon which Vernon Road and the adjacent ditch lie, would ordinarily arise in the Oklahoma Supreme Court. However, it is our job to determine if the property is Indian Country for purposes of criminal jurisdiction.

ans, their land and property, which it had prior to the passage of the act." *Id.* at 979 (quoting *Tiger v. Western Inv. Co.,* 221 U.S. 286, 309, 31 S.Ct. 578, 584, 55 L.Ed. 738 (1911)).

¶ 25 The language pertaining to public roads in the 1902 Act was the Creek Nation's acknowledgement of the future State of Oklahoma's right to establish public highways along the section lines, without compensating the Creek Nation therefore. The Act thus creates an easement or right-of-way for public highways, with title to the underlying lands remaining in the Creek Nation and its subsequent allottees, who took their allotment subject to the right-of-way.[7]

¶ 26 This interpretation is consistent with testimony and exhibits admitted at the remanded evidentiary hearing. A title opinion admitted at the hearing and rendered by attorney Keith Ham[8] finds as follows:

> We understand that there is a roadway located upon the West side of captioned property, along or upon the Section 27 and Section 28 section line. Inasmuch as we did not find any easement or other conveyance for roadway purposes in favor of the State of Oklahoma (or agency thereof) or McIntosh County, the only apparent legal basis for the establishment or the existence of a roadway ... is pursuant to 32 Stat. 500. This statute provided that highways or roads may be established along all section lines located within the Creek or Muscogee Nation.... Captioned property is located within the boundaries of the Creek or Muscogee Nation and thus this statutory easement would apply to the above captioned property. This easement for roadway establishment *did not alter the fact that the allottee took title to his or her allotment and owned the fee simple title in and to their entire allotted land.* It is our opinion that the ownership of the minerals and mineral rights as owned by

Joe McGilbray and Roy T. Ussrey[9] as restricted interests as set forth above *extends to the Section 27 and Section 28 section line.* In the event the roadway in the area of the Section 27 and Section 28 section line is located upon any portion of captioned property, *it is our opinion that Joe McGilbray and Roy T. Ussrey own their respective restricted ownership interest as set forth above in and under said roadway* insofar as the same is located upon captioned property.

(emphasis and added).

¶ 27 The State presented no expert testimony on title to the land in question that disagreed with Mr. Ham's opinion. Jeff Dell, an Assistant Realty Officer for the Creek Nation, rendered a title opinion on behalf of the State concerning the entire tract (N/2 SW/4 and S/2 NW/4 of Section 27, Township 9 North, Range 13 East, McIntosh County), which had originally been allotted to Lizzie Smith (and which is sometimes referred to as the "Busby tract"). The opinion was silent regarding any ownership in this tract by the State of Oklahoma. However, in an affidavit attached to Petitioner's Reply to the State's Response to Petitioner's Second Application for Post–Conviction Relief, Dell stated:

> I understand that the State of Oklahoma has taken the view that the restricted ownership interest of the Busby tract is immaterial to state jurisdiction because the section line county road known as the Vernon Road, also known as NS 398, which runs on the west side of the Busby tract is the situs of the mortal wounds to the victim in Mr. Murphy's case and the road is maintained by McIntosh County. I can express no opinion regarding the significance to jurisdiction of where the injuries occurred to the victim in Petitioner's case. I can, however, clarify that the State of Oklahoma does not own the Vernon Road as it runs on the west side of the Busby tract.

---

7. Paragraph 17 of the same Act allows the Creek allottees to lease the minerals to their lands, "with the approval of the Secretary of the Interior, and not otherwise."

8. Ham is an attorney in Bristow. He specializes in the area of title and regularly renders title opinions for banks, title companies, and the Creek Nation. He is a past president of the Creek County Bar Association and Muscogee (Creek) Nation Bar Association. Ham is well versed in the area of the Creek Allotment process.

9. McGilbray and Ussrey are Indian heirs to original Creek allottee Lizzie Smith.

The Busby tract ownership, pursuant to 32 Stat. 500, 502 (1902), runs to the section line and title thereto is vested in the owners of the Busby tract and not the State of Oklahoma.

During the evidentiary hearing Dell testified the entire tract was within the historical boundaries of the Creek Nation. Moreover, some documents appear to indicate that the current non-Indian landowners of property abutting Vernon Road pay taxes with respect to the Vernon Road tract.

¶ 28 The Associate District Judge relied on Section 2, Article 16 of the State Constitution in finding the land in question was owned by the State and was not an easement. However, this constitutional provision was long ago studied by the Oklahoma Supreme Court in *Mills v. Glasscock*, 1909 OK 77, 110 P. 377, 378–79. There, the Court at all times treated the Constitutional provision as indicative of the State's acceptance of an easement or right-of-way along section lines for purpose of public highways.

¶ 29 As for other cases, *Kansas Natural Gas Co. v. Haskell*, 172 F. 545 (C.C.E.D.Okla.1909), and cases cited therein, is particularly instructive. There, in construing similar language from similar treaties between the United States and the Cherokees, the Federal Circuit Court for the Eastern District of Oklahoma found:

> The fee to the rural public highways in that portion of this state formerly comprising Indian Territory, and now the Eastern district, does not vest in the state for the benefit of the whole people, as premised by the defense; but it does vest in the abutting landowners. The public have only a perpetual servitude or easement therein. . . . It is clear, therefore, that the fee to the land comprising rural highways in what was formerly Indian Territory vests in the abutting landowners, subject only to the easement granted the public for high-

way purposes, following the rule of common law.

*Id.* at 567–68; *see also Paschall Properties v. Board of County Comm'rs*, 1987 OK 6, ¶ 6, 733 P.2d 878, 879 (finding similar language in Cherokee Allotment Act means allottees "take their title to these lands subject to this ability to establish roads"); *Oldfield v. Donelson*, 1977 OK 104, ¶ 7, 565 P.2d 37, 40 (State has an easement in Osage Nation section line roads).

■ ¶ 30 It seems clear that title to the land upon which Vernon Road lies was conveyed to the Creek allottees who owned the property abutting the road. But now we must ascertain whether the Indian title to this particular tract has since been extinguished before state criminal jurisdiction may be exercised.

■ ¶ 31 This is a challenging issue. Criminal jurisdiction is determined according to where a crime occurred, which is largely a geographic fact determination. In the instant case, the record shows the crime occurred on land originally allotted to Lizzie Smith, a member of the Creek Nation. However, all surface rights to the property have since been conveyed away to non-Indians. Thus, non-Indians own the actual physical property upon which the crime occurred, which suggests jurisdiction rightly belongs with the State.

¶ 32 However, not all of the fee interest in the original allotment has been conveyed to non-Indians. According to the evidentiary hearing record, while non-Indians own the surface and eleven twelfths of the minerals in the tract where the crime occurred, one twelfth of the mineral interest remains restricted with the Indian heirs of Lizzie Smith. The question is whether this small mineral interest is sufficient to qualify the property as an Indian allotment, the Indian title to which has not been extinguished, under 18 U.S.C. § 1151(c).[10]

---

10. A variation of this question might be whether the 1/12th mineral interest remains part of "Indian country" while the remaining interest is not. In other words, does title to the entire allotment have to be extinguished or can that allotment lose its Indian title distinction piece by piece? For example, if Lizzie Smith had conveyed the entire surface and minerals to the south half of her allotment, did that southern half lose its Indian Country label, or does it retain that label until all of the northern half is conveyed to non-Indians? And does this situation change if the conveyance was a one-half interest in the allotment as a whole?

¶ 33 We've found no definitive answer to this question.

¶ 34 The Associate District Judge, however, found the Indian title had indeed been extinguished:

> Even if the crime scene could be defined as Indian country based on the 1/12th restricted mineral interest remaining in the adjacent property, the wholly unrestricted surface ownership on both sides of Vernon Road, coupled with the State's compelling interest in enforcing its penal laws and protecting its citizens would permit the State to exercise jurisdiction in this case.

¶ 35 And yet, no witness at the evidentiary hearing took this position. Monta Sharon Blackwell, former Deputy Commissioner of Indians Affairs at the Department of the Interior, testified that the Indian title to the allotment formerly owned by Lizzie Smith had not been extinguished and that it remained Indian country as that expression is used under federal law. Ms. Blackwell testified that the Department of the Interior considered Indian mineral interests, as the dominant interests in the land, to be worthy of protection and that the mineral estate in this particular area was quite valuable. Furthermore, whenever an Indian attempted to sell an allotment, Department of the Interior representatives would encourage them to retain one half of the minerals. When asked if she would agree that the Indian title to the surface had been extinguished, Ms. Blackwell expressed doubt one could divide the surface and mineral estates "in that way." But she admitted she knew of no case that stood for the question presented here, i.e., whether a fractional restricted mineral interest is sufficient to confer criminal jurisdiction.

¶ 36 We, too, have not found a case that stands for that exact position,[11] although we have found several cases that are close,[12] analagous,[13] or at least somewhat relevant.[14]

11. But we've also been unable to find a case stating otherwise, i.e., that Indian title to a former allotment has been extinguished even though Indians have retained a fractional restricted mineral interest in the allotment.

12. In *Cravatt v. State*, 1992 OK CR 6, 825 P.2d 277, the victim was killed on a former Indian allotment, the title of which was mixed—a 1/7th interest in the fee had been conveyed away to non-Indians. (Unlike the instant case, the surface and minerals had not been separated.) This Court found Oklahoma lacked criminal jurisdiction, ruling: "We do not find that this small interest in the property is sufficient to justify State intervention in a matter which would otherwise be statutorily reserved for the federal government." *Id.* at ¶ 19, 825 P.2d at 280. The Court then stated, "[W]e do not find that the State's interest, only marginally justified, outweighs the federal preemption in this case." *Id.* at ¶ 20; *but see Hanes v. State*, 1998 OK CR 74, 973 P.2d 330, 337 (a curiously convoluted case where the Court seems to find Indian title to the western half of the Grand river "at the location of the Miami city park" had been extinguished by conveyance in fee simple to the city of Miami).

13. *See, e.g., C.M.G. v. State*, 1979 OK CR 39, ¶ 7, 594 P.2d 798, 801 (finding a truism of Indian law is that doubtful expressions in Indian treaties and Acts of Congress dealing with Indians are to be resolved in favor of the Indians and that cases in which land claimed to be Indian country was found not to be have involved land to which the Indians "clearly and specifically had ceded all claim, right, title, and interest to the lands without any reservation whatsoever."); *United States v. Soldana*, 246 U.S. 530, 532–33, 38 S.Ct. 357, 358, 62 L.Ed. 870 (1918) (rejecting a claim that Crow reservation Indian title to the soil on which a railroad platform stood had been extinguished, regardless of whether or not the strip in question, which was owned by non-Indians, was a mere easement or limited fee.); *Ahboah v. Housing Authority of Kiowa Tribe*, 1983 OK 20, ¶ 16, 660 P.2d 625, 629, ("[T]he Supreme Court has held that an interest in Indian lands in less than fee simple, held by a non-Indian, does not deprive the lands of their Indian character.")

14. In *State v. Burnett*, 1983 OK CR 153, ¶ 8, 671 P.2d 1165, 1167, *overruled, in part, on a separate issue in State v. Klindt*, 1989 OK CR 75, ¶ 6, 782 P.2d 401, 403, the Court found the language "all Indian allotments, the Indian titles to which have not been extinguished" in 18 U.S.C. § 1151(c) was "broad enough to encompass all Indian allotments while the title to same shall be held in trust by the Government, *or while the same shall remain inalienable by the allottee without the consent of the United States.*" (emphasis added) (The testimony at the evidentiary hearing indicated the U.S. would have to approve any leases as to the remaining 1/12th restricted mineral interest.) *See also HRI, Inc. v. Environmental Protection Agency*, 198 F.3d 1224, 1254 (10th Cir.2000) (finding the "split nature of the surface and mineral estates does not alter the jurisdictional status of these lands" for Safe Drinking Water Act purposes: "[I]f ownership of mineral rights and the surface estate is split, and either is considered Indian lands, the Federal EPA will regulate the well under the Indian land program."); *Rose-*

But considering those authorities, the evidentiary hearing testimony, and the entire record before us, we remain unconvinced that the crime occurred on Indian country, at least under 18 U.S.C. § 1151(c), pertaining to allotments.

¶ 37 George Jacobs was murdered in McIntosh County in August of 1999. The crime occurred on a county section line road in a remarkably rural, heavily treed location, without any sort of improvement noticeable in the photographs, except perhaps a rickety barbed wire fence. The crime occurred approximately one mile north of the small town of Vernon, a town supposedly established by freed black slaves, and four or so miles from the equally small town of Hanna.

¶ 38 Authorities investigated the matter during the relevant time period. As a result state murder charges and a bill of particulars were filed against Petitioner. Trial was held in April of 2000, and Petitioner was convicted of First Degree Murder. Since then the matter has been continuously on appeal.

¶ 39 We find it significant that federal authorities have never attempted to exercise jurisdiction over this crime in the five years since it occurred. Meanwhile, the State of Oklahoma has spent considerable time and money prosecuting and defending Petitioner in the district and appellate courts.

¶ 40 This case presents two separate and distinct estates in land, i.e., a surface estate and a mineral estate, each subject to being severed and separately conveyed. The uncontradicted evidence shows that the surface estate was separated from the mineral estate on the land where the crime occurred. Also, the uncontradicted evidence shows that, as to the surface estate, the Indian allotment had been extinguished by conveyances to non-Indian landowners prior to the time of the crime.

¶ 41 Even as to the remaining Indian allotment mineral estate, the uncontradicted evidence was that all but 1/12th had been extinguished by conveyances to non-Indians.

■ ¶ 42 A fractional interest in an unobservable mineral interest is insufficient contact with the situs in question to deprive the State of Oklahoma of criminal jurisdiction. When two jurisdictions are competing for jurisdiction over a particular issue (or seeking to determine which has jurisdiction), it is an established principle of comparative law to look at the contacts each jurisdiction has with the subject matter at issue.[15] Here, the subject matter is criminal jurisdiction, and the State of Oklahoma's contacts and interests in the subject property overwhelm the fractional interest an Indian heir may own in an unseen mineral estate.

¶ 43 To allow this unobservable fractional interest to control the enforcement of laws on the surface of the land would be analogous to condoning the type of serious problems enunciated by the U.S. Supreme Court this term in *City of Sherrill, N.Y. v. Oneida Indian Nation*, 544 U.S. ——, 125 S.Ct. 1478, 1493, 161 L.Ed.2d 386 (2005), i.e., a "checkerboard of alternating state and tribal jurisdiction in New York State—created unilaterally at OIN's behest" that "would 'seriously burde[n] the administration of state and local governments' and would adversely affect landowners neighboring the tribal patches." While that case dealt with a tribe attempting to reestablish sovereignty over land purchased in fee from non-Indians, the principle still applies.

¶ 44 The land in question had its Indian Country characteristics extinguished through conveyances to non-Indians, thus giving notice to the public that it was no longer Indian land and that the State of Oklahoma's laws would apply. While some authorities sug-

*bud Sioux Tribe v. Kneip*, 430 U.S. 584, 604–605, 97 S.Ct. 1361, 1372, 51 L.Ed.2d 660 (1977) ("The longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and land use," may create "justifiable expectations.")

**15.** For example, in the area of Due Process, the United States Supreme Court looks to a nonresident defendant's "minimum contacts" with a state to determine if jurisdiction can be exercised over that defendant. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Court determines if a defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

gest, to varying degrees, that "Indian country" status may still be attached to the property in question, we have found no case holding that the retention of small (although not insignificant) mineral interest is enough in and of itself to prevent the Indian title from being considered extinguished under federal law, especially in the context of criminal jurisdiction.

¶ 45 Criminal jurisdiction has always been tied to geography, i.e., where the crime occurred. Common sense tells us that this issue has more to do with surface rights than underground minerals, since it is virtually impossible to commit a crime against a person within a mineral interest sub-surface strata. Plus, we see little, if any, value in a system that would require a title search to the extent required here, i.e., researching allotments, heirs of allottees, and fractional mineral interests,[16] in order to determine whether criminal jurisdiction is state or federal. Such a system would seriously burden both the state and federal governments.[17]

¶ 46 We therefore agree with the District Court's most important conclusion: that, pursuant to the reasoning in *Cravatt*, the Indian title to the tract formerly allotted to Lizzie Smith has been extinguished for purposes of criminal jurisdiction over the crime in question. Absent clear authority requiring a different interpretation, we refuse to vacate the state murder conviction and death sentence based on a theoretical interpretation of federal law.

 ¶ 47 The remaining issue, under proposition one, is whether or not the land in question is part of a Creek Nation reservation that has never been disestablished or is part of a dependent Indian community. Unfortunately, the District Court decided, based

upon the Assistant District Attorney's urging, that these questions were beyond the scope of the evidentiary hearing, even though we clearly asked the Court to determine if the tract in question was Indian country under 18 U.S.C. § 1151.

¶ 48 Be that as it may, the error was alleviated when the District Court allowed Petitioner's counsel to make an extended offer of proof regarding the testimony and evidence that would have been presented on these two questions had that opportunity been given. Accordingly, we find the error was harmless. Even if the evidence had been admitted, it is insufficient to convince us that the tract in question qualifies as a reservation or dependent Indian community.

¶ 49 Petitioner's proffered expert, Monta Sharon Blackwell, stated by affidavit that "[t]here was never a formal Creek Nation 'reservation' but for practical purposes" certain treaty language was "tantamount to a reservation under Federal law." Thus, the "Creek Nation, historically and traditionally, is a confederacy of autonomous tribal towns, or Talwa, each with its own political organization and leadership."

¶ 50 Ms. Blackwell and Jeff Dell both took the position that the historical boundaries of the Creek Nation remained intact even after the various Creek lands were subjected to the allotment process, but no case is cited for the position that the individual Creek allotments remain part of an overall Creek reservation that still exists today.[18]

¶ 51 The best authority on this point is *Indian Country, U.S.A., Inc. v. State of Oklahoma*, 829 F.2d at 975, which treats the Creek Nation lands as a "reservation" as of 1866.[19] However, the Tenth Circuit declined

---

16. For example, some of the evidence presented on title takes the position that the heirs of Lizzie Smith (and one of her supposed heirs) have never been judicially determined. As such, we would need a quiet title suit in order to be certain that all surface rights have been conveyed to non-Indians.

17. Furthermore, if Petitioner's position is correct, then a great portion, if not most, of eastern Oklahoma would still be considered Indian country today. The tax implications alone would be staggering.

18. It seems redundant, however, to treat lands as both a reservation and an allotment. Section 1151 clearly makes a distinction between the two.

19. The case finds the term "reservation," for purposes of defining Indian country, "simply refers to those lands which Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments." 829 F.2d at 973.

to answer the question of whether the exterior boundaries of the 1866 Creek Nation have been disestablished and expressly refused to express an opinion in that regard concerning allotted Creek lands. *See id.* at 975 n. 3, 980 n. 5.

¶ 52 If the federal courts remain undecided on this particular issue, we refuse to step in and make such a finding here.

¶ 53 Regarding the issue of dependent Indian communities, the evidence supporting that claim is thin, especially in regard to the issue of dependency. Petitioner has submitted photos of some Indian cemeteries and churches within three to four miles of the site, and there is an Indian community center near the town of Hanna. Petitioner has also submitted evidence that the Creek Tribal Town of Weogufkee, reportedly one of the 44 original tribal towns and founded in 1858, is somewhere nearby. Also, there is evidence of Creek Nation voting districts in the area. No evidence was submitted regarding the exact Indian demographics of this region as it stands today.[20] However, an affidavit states that Weogufkee had a population of 750, but that was in 1935.

¶ 54 A dependent Indian Community refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements: first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. *Alaska v. Native Village of Venetie Tribal Government,* 522 U.S. 520, 527, 118 S.Ct. 948, 953, 140 L.Ed.2d 30 (1998). As an allotment, it is doubtful this particular tract could qualify as a part of a dependent Indian community. But, more importantly, there does not seem to be much federal superintendence. Most certainly, there is much less federal control in this case than there was in *Eaves v. State,* 1990 OK CR 42, 795 P.2d 1060, 1063, a case where we found a housing project owned by the Osage Tribal Housing Authority was not a dependent Indian community under 18 U.S.C. § 1151. We believe this case falls within the teaching of *United States v. Blair,* 913 F.Supp. 1503, 1512 (E.D.Okla.1995), and the tract in question is simply a "typical slice of rural eastern Oklahoma occupied by a mixed culture of people attempting to hold on to their agrarian roots." Proposition one thus fails.

¶ 55 In proposition two, Petitioner claims he was denied the right to a jury trial on the issue of mental retardation by our decision in his first post-conviction appeal. *See Murphy v. State,* 2003 OK CR 6, 66 P.3d 456. He claims this was arbitrary and capricious, a denial of equal protection, and a deprivation of rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments.

■ ¶ 56 This Court's mental retardation jurisprudence has been in a state of flux since *Atkins v. Virginia* was handed down. Petitioner's mental retardation claim was the first such claim addressed by this Court in the aftermath of *Atkins,* and various procedural changes have taken place since that time. While the trial judge and our prior cases have voiced strong doubts about Petitioner's mental retardation claim, a majority of this Court now finds he has provided sufficient evidence in his post-conviction appeals to raise a fact question on this issue, thereby warranting a trial on Petitioner's mental retardation claim.[21]

---

20. No data from the U.S. Census Bureau was offered. However, Courts have often taken judicial notice of such data. *See e.g., Village Bank v. Seikel,* 1972 OK 123, 503 P.2d 550, 553. Hypothetically, were we to do the same here, it appears we would find that only 16.2 % of the residents of McIntosh County reported being American Indian, i.e., approximately 3,200 people over the entire county. On the other hand, white persons constituted 72.6 %, African Americans 4.1%, and Hispanics 1.3%. www.quickfacts.census.gov.

21. I personally disagree with the Court's resolution of proposition two for the following reasons.

First, Petitioner is not mentally retarded. Second, he never made a *prima facie* showing of his claim, as his abbreviated IQ test was insufficient to get him past the required threshold of providing at least one IQ test score under 70. Third, the matter is *res judicata,* as three judges from this Court (myself, Judge C. Johnson, and Judge Lile) have previously rejected this identical claim in a previous appeal. And finally, the fact that Petitioner is the only defendant who was unable to sufficiently raise a fact question concerning his mental retardation claim does not mean he was treated differently. But I defer to the majority on this issue.

¶ 57 In proposition three, Petitioner claims, for the first time, that Oklahoma's lethal injection procedure violates the Eighth Amendment prohibition against cruel and unusual punishment.[22] He claims Oklahoma's "protocols" for carrying out such executions create a substantial risk of conscious suffocation or conscious suffering of excruciating pain and that several such Oklahoma executions have "gone wrong." [23]

¶ 58 Petitioner has waived any error relating to this claim by failing to raise it in his May 3, 2001 direct appeal brief and his February 7, 2002 post-conviction application. He admits the claim was available in March of 2001. Moreover, the statute upon which such executions are based, 22 O.S.2001, § 1014(A),[24] has not been amended since 1977.

### DECISION

¶ 59 After carefully reviewing Petitioner's post-conviction application and supporting documentation, along with all matters from the remanded evidentiary hearing, we find relief is warranted with respect to his mental retardation claim. Accordingly, Petitioner's Application for Post–Conviction Relief is hereby **DENIED** with respect to propositions one and three, but **GRANTED** with respect to proposition two. This matter is hereby **REMANDED** to the District Court of McIntosh County for a jury trial on Petitioner's mental retardation claim, consistent with this opinion and the procedures adopted by this Court in our recent mental retardation jurisprudence.

CHAPEL, P.J., C. JOHNSON, A. JOHNSON and LEWIS, JJ.: concur.

22. Petitioner also claims the procedure violates the Fifth and Fourteenth Amendments, but he never explains how.

23. The specific allegations (chronicled by a report from an euthanasia panel and affidavits from Oklahoma State Penitentiary Warden Mike Mullin, physician Mike Heath, and two attorneys who witnessed the execution of Loyd Lafevers on January 30, 2001) are disconcerting. If true, they merit serious attention from the legislature and/or those in charge of the statutorily based responsibility of carrying out the execution "according to accepted standards of medical practice." (See below.) However, it appears Oklahoma's protocols, i.e., the exact drugs and distribution method, are not statutorily based. Corrections officials change those protocols from time to time, as new information is gathered. If Petitioner's allegations have merit, we have every reason to believe the necessary changes will be implemented.

24. The punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with a chemical paralytic agent until death is pronounced by a licensed physician, according to accepted standards of medical practice.